UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN A. & KATHY STEPNIAK,

                              Plaintiffs,

v.

UNITED MATERIALS, LLC,

                              Defendant.
_____

**FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER**

03-CV-0569(M)

## BACKGROUND

        The relevant factual background of this action is set forth in my September 2, 2009 Report and Recommendation [67],[1] which was adopted by Judge Arcara [68] and is reported at 2009 WL 3077888. Counsel for plaintiffs and defendant United Materials, Inc. ("UM") consented to trial before me [71], and a bench trial was held before me on December 10, 2009 [78]. Plaintiffs' exhibits ("PX") 1-93 and defendant's exhibits ("DX") A-D were admitted into evidence by stipulation. Plaintiff John Stepniak was the only witness to testify on behalf of plaintiffs.

        After plaintiffs rested their case, counsel for UM moved for dismissal, arguing that plaintiffs had failed to meet their burden of proof on several issues. Since this is a nonjury trial, that motion is governed by Fed. R. Civ. P. ("Rule") 52(c), which states that "if a party has

---

[1]     Bracketed references are to CM-ECF docket entries.

1

been fully heard on an issue during a nonjury trial, and the court finds against the party on that issue, the court may enter judgment against the party on a claim . . . that, under the controlling law, can be maintained . . . only with a favorable finding on that issue".

"Unlike under Rule 50 which governs judgment as a matter of law in jury trials, under Rule 52(c), the court does not consider the evidence in the light most favorable to the non-moving party . . . . Rather, the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies . . . . Rule 52(c) implies the same inquiry the Court makes to resolve all of the legal and factual matters under Rule 52(a)." Wechsler v. Hunt Health Systems, Ltd., 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004). *See also* 9C Wright & Miller, Federal Practice & Procedure (3d. Ed.) §2573.1 ("the court is not as limited in its evaluation of the nonmovant's case as it would be on a motion for judgment as a matter of law. The trial judge is not to draw any special inferences in the nonmovant's favor nor concern itself with whether the nonmovant has made out a prima facie case. Instead, since it is a nonjury trial, the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself in which party's favor the preponderance of the evidence lies. Since it is serving as the trier of fact, the court even may assess the credibility of the witnesses").

I reserved decision on UM's oral motion. By Text Order dated December 11, 2009 [79], I gave plaintiffs the opportunity to respond to the motion "by the later of January 7, 2010 or two weeks after receipt of the transcript from the . . . bench trial". In response to my law clerk's inquiry to both counsel as to the whereabouts of the trial transcript, on April 13, 2010 UM's counsel responded that plaintiffs' counsel had received the trial transcript "a long time ago". Plaintiffs' counsel did not respond to the inquiry. Accordingly, by Text Order dated

April 15, 2010 [80], I directed counsel to file the trial transcript with the court by April 21, 2010, and stated that "since neither party has shown good cause for their failure to adhere to the deadlines for post-trial briefing . . . no further submissions will be accepted".

**ISSUE FOR DETERMINATION**

As stated in my summary judgment decision, the remaining issue for trial in this case is whether UM violated Section 404 of the Clean Water Act (33 U.S.C. §1344) by depositing "fill material" into waters of the United States without a permit. "If a person discharges fill material into U.S. waters without a §404 permit or without qualifying for one of the permit exemptions, that person violates the CWA." Stepniak v. United Materials, LLC, 2009 WL 3077888, *3 (W.D.N.Y. 2009). "'The term fill material means material placed in waters of the United States where the material has the effect of . . .[c]hanging the bottom elevation of any portion of a water of the United States.' 33 C.F.R. §323.2(e)(1)." Id. at *4.

Plaintiffs allege that in the summer of 2000, UM was responsible for allowing a run-off of fly ash from its facility (located at the southeast corner of Pavement and Peppermint Roads in the Town of Lancaster, New York), resulting in a deposit of this material into a ditch and adjacent portions of plaintiffs' property located on the west side of Pavement Road. In order to prevail in this action, plaintiffs must prove, *inter alia,* that UM caused the deposit of materials which changed the bottom elevation of the ditch on their property, so as to qualify as "fill materials" within the meaning of the Clean Water Act. If they have not proven this fact, then they have not proven a violation of the Act.

In moving for dismissal, UM argued, *inter alia*, that plaintiffs have failed to prove that materials originating with UM have changed the bottom elevation of the ditch running through plaintiffs' property, and, therefore, that UM caused the deposit of "fill material". These Findings of Fact and Conclusions of Law will focus upon that issue.[2]

These Findings are based upon my review of the trial exhibits as well as my assessment of Mr. Stepniak's credibility, based upon the substance of his testimony as well as his demeanor on the witness stand. Since neither party has complied with my order to file the trial transcript, I have relied upon my contemporaneous notes from the trial. Where I find the proffered evidence not to be credible, my reasons for that finding are set forth.

**FINDINGS OF FACT**

1. UM is a concrete plant located on the southeast corner of Pavement and Peppermint Roads in the Town of Lancaster, New York.

2. In approximately 1987, the Stepniaks purchased 12 acres of unimproved agricultural property abutting the west side of Pavement Road, across from the current site of UM. They sold a parcel of that property to Mr. Stepniak's parents, and built their home on another parcel.

---

[2] Plaintiffs also bear the burden of proving other facts, such as that the ditch is part of the "waters of the United States". However, unless they first prove that UM caused a change in the bottom elevation of the ditch, I need not make findings on other issues, since plaintiffs cannot prevail in any event. "Courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach." Immigration and Naturalization Service v. Bagamasbad, 429 U.S. 24, 25 (1976); 9 Moore's Federal Practice (Third Ed. 2009), §52.15[2][d].

3. Approximately five years ago the Stepniaks sold the parcel of property on which their home was located, and moved to Clarence. However, they retained a six-acre lot having 50' of frontage on Pavement Road.

4. For approximately two years in the early 1990s, Mr. Stepniak worked as a truck driver for Frey Concrete, located at the current site of UM. Frey handled fly ash, which was kept in a pile at the bottom of a deep quarry behind the plant.

5. From that experience, he was familiar with the appearance of fly ash, which has a very fine consistency.

6. For several months in the year 2000, he observed a pile of fly ash in the parking lot of UM's facility. The location of the pile is depicted on DX A.

7. At some point in 2000 a windstorm blew fly ash from the pile on UM's site onto the Stepniaks' property. The windows were open and it blew into their house, covering all flat surfaces.

8. Mr. Stepniak complained to a gentleman named "Augie" at UM (presumably referring to UM's Vice President and General Manager August Iacovitti, referred to in PX 71 and 72). Augie apologized, and acknowledged that it was fly ash. However, UM did not offer to clean up on this occasion, and Mr. Stepniak cleaned up himself.

9. During a rainstorm in early August 2000, more fly ash washed off the pile on UM's property, traveled through a culvert underneath Pavement Road, and washed into the ditch on the west side of Pavement Road, heading north toward Ellicott Creek. Mr. Stepniak observed the charcoal-black water on that day, which he had never seen before.

10. That incident is also reflected in the affidavit of UM's Comptroller, Roger Ball (PX 70) and in UM's report dated August 15, 2000 (PX 71).

11. Following the incident, UM relocated the fly ash stockpile to a site further away from Pavement Road. *See* DX A, C.

12. Mr. Stepniak is unaware of any further deposits of fly ash on his property since the August 2000 incident.

13. After this incident Mr. Stepniak again complained to Augie, who admitted that fly ash had run off UM's property but said that it was nothing to be alarmed about.

14. UM then sent a pickup truck and washed the fly ash down plaintiffs' driveway onto the road. UM later took cement mixers with water and washed their own property.

15. Mr. Stepniak claimed that a fly ash deposit covered a portion of his property extending 50 - 60' from the ditch toward his house, which worked its way into the soil, that it left a cloud of black dust when he cut his lawn, and that he would track black footprints when he walked across grass.

16. He did not believe that there are sources other than UM that use fly ash in the area.

17. He admitted that fly ash is not a hazardous waste.

18. He claims that trees in his front yard were healthy prior to the runoff, but that they deteriorated in the following years, and died in 2002, whereupon he cut them down.

19. In 2005 he put his house up for sale. He dug up the soil in his front yard because he was convinced that fly ash was in the soil. He used a backhoe to remove the soil down to clay, put soil in containers and had it hauled away, then re-soiled and re-planted. He

plowed the entire width of the lot from the ditch 60' back to his house. As he excavated, he claims to have seen fly ash down to the clay.

20. The ditch runs continuously from his vacant lot to Ellicott Creek, a distance of approximately 1/4 mile. Water runs through the ditch during most of the year. Occasionally during the summer months water is not visible, but the ditch is moist.

21. PX 1 - 67 are photos taken on November 16, 2009.

22. On that day, Mr. Stepniak, along with his brother, his attorney David Seeger, and Mr. Seeger's associate, dug soil samples from in and around the ditch.

23. PX 5 - 8 show what Mr. Stepniak claims to be fly ash.

24. PX 79 is a sample bag of what was dug up and shown in PX 5-8.

25. PX 7 shows what Mr. Stepniak claims to be fly ash on the left side, and topsoil without fly ash on the right side. He claims that the material on the left side is similar to what he removed from his property in 2005.

26. PX 12 and 14 show water in the ditch.

27. PX 44 shows 6-8" of what Mr. Stepniak believes to be fly ash, which is closer to Ellicott Creek than his property.

28. PX 79 is a soil sample taken from plaintiffs' property.

29. When asked where the fly ash is in PX 79, Mr. Stepniak admitted that he could not identify it.

30. Although he claimed that fly ash raised the bottom elevation of his ditch, Mr. Stepniak admitted that he does not know what happens when fly ash mixes with water.

31. He admitted that he did not have his soil tested.

32. He acknowledged that his opinion as to the presence of fly ash was based strictly upon the dark color of the soil, but admitted that it could also be silt, peat, or topsoil.

33. He could not recall whether the Town had cleaned the ditches since the 2000 incident.

34. He did not take any soil samples from those portions of the ditch on the other side of the culvert where the runoff occurred, and admitted that those samples could be the same color and texture as samples he took.

35. While he stated that the ditch is "full of something", he admitted that he cannot say for sure what changed its bottom elevation.

36. Given the above findings, I further find that plaintiffs have failed to prove that there was a change in the bottom elevation of the ditch on their property, or that any such change (if there was one) was attributable to fly ash or other materials originating at UM.

**CONCLUSIONS OF LAW**

1. Since I have found that plaintiffs failed to prove that any materials deposited on their property by UM caused a change in the bottom elevation of the ditch adjacent to Pavement Road, I conclude that UM has not deposited "fill materials" onto their property, and, therefore, that UM has not violated Section 404 of the Clean Water Act (33 U.S.C. §1344).

## ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, UM's oral motion for judgment is granted, and the Clerk of the court is hereby directed to enter final judgment in favor of UM.

**SO ORDERED.**

DATED: June 11, 2010

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge
